# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 491 | **DATE** | 12/23/2003 |
| **CASE TITLE** | Wallace, et al. vs. The Chicago Housing Authority, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion to dismiss Counts IV, XI and XII of Plaintiff's first amended complaint [17-1] is granted. Defendants' motion to dismiss the remaining counts is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | date docketed |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| RO | courtroom deputy's initials | date mailed notice |

DEC 2 4 2003

Document Number

27

U.S. DISTRICT COURT
CLERK
03 DEC 23 AM 2: 57

FILED

date/time received in central Clerk's Office   mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DIANE LINK WALLACE, ANGELA MAPLES,)
LISA TAYLOR, MARY E. SISTRUNK, )
PANDORA MEADORS, ANNIE R. SMITH, )
and NICHELLE HART, on behalf of themselves )
and all others similarly situated, )
                                   )     **No. 03 C 0491**

           Plaintiffs, )

                                      )     **Judge Ruben Castillo**

     v. )

THE CHICAGO HOUSING AUTHORITY, an )
Illinois Municipal Corporation, and TERRY )
PETERSON, in his official capacity as Chief )
Executive officer of the CHA, )

           Defendants. )

DO...
DEC 2 4 2003

## MEMORANDUM OPINION AND ORDER

        Defendants the Chicago Housing Authority ("CHA") and Terry Peterson, Chief Executive

Officer of CHA, move to dismiss Plaintiffs' First Amended Complaint pursuant to Federal Rule

of Civil Procedure 12(b)(6). For the following reasons, Defendants' motion is granted in part

and denied in part. (R. 17-1.)

### RELEVANT FACTS

        Plaintiffs sued on behalf of a class of current and former residents of CHA who were, or

will be, relocated from public housing during CHA's process of demolishing its high-rise

apartment complexes in lieu of new, mixed-income communities. (R. 14-1, Am. Compl. ¶¶ 1,

3.) During that time until the present, Plaintiffs claim, CHA knowingly failed to provide

adequate relocation services to them or provided relocation services that either: (1) discouraged

Plaintiffs from renting in white or integrated neighborhoods; or (2) steered Plaintiffs to

predominantly African-American neighborhoods. (*Id.* ¶ 3.) According to the complaint, as a result of CHA's practices, Plaintiffs became segregated in African-American communities "characterized by high poverty, high crime, poor schools and poor municipal services." (*Id.*)

During the demolition of CHA high-rises, Defendants provided relocation services under a government program called the Housing Choice Voucher ("HCV") Program, which is one of several federal rental subsidy programs ultimately administered by the United States Department of Housing and Urban Development ("HUD"). (*Id.* ¶¶ 34-35.) Under the HCV Program HUD funds and regulates state or local governmental entities called public housing agencies ("PHAs"). (*Id.* ¶ 35.) In Chicago, CHA is the PHA responsible for administering the HCV program, but CHA has contracted with other consulting companies to directly administer the program. (*Id.* ¶ 36.) Families participating in the HCV program rent units that meet program quality standards. (*Id.* ¶ 37.) Under the HCV Program, CHA is prohibited by federal law from restricting the resident's choice of location, and thus CHA residents may select a rental unit anywhere in the private market that lies within CHA's jurisdiction or even anywhere in the United States that administers a voucher program. 42 U.S.C. § 1437f(r)(1)(A).

According to the complaint, CHA's relocation policies have had the effect of discouraging Plaintiffs from inspecting or renting in predominantly white or racially integrated neighborhoods because: (1) at first, CHA failed to provide any relocation services whatsoever; (2) when CHA did begin offering relocation services, its agents failed to inform Plaintiffs of the desirable features of white or racially integrated neighborhoods; (3) CHA or its agents actively steered Plaintiffs to predominantly African-American neighborhoods; and (4) CHA failed to

2

effectively and affirmatively assist families in moving to integrated neighborhoods. (R. 14, Am. Compl. ¶ 70.)

From 1995 through 1997, CHA offered no relocation services, (*id.* ¶ 95), but did offer some relocation services from 1997 until 1999, (*id.* ¶ 96). In January 2000 CHA submitted a 10-year Plan for Transformation to HUD. (*Id.* ¶ 86.) The Plan called for demolition of all CHA high-rise developments, as well as redevelopment of enough units to accommodate all qualified families residing in CHA housing as of October 1, 1999. (*Id.* ¶ 87.) In February 2000 HUD approved the Plan and entered into the Moving to Work Agreement with CHA. (*Id.* ¶ 88.) The Moving to Work Agreement contained several provisions related to the demolition, replacement and rehabilitation of thousands of public housing units, and promised substantial federal funds to accomplish these goals. (*Id.*) Additionally, the Moving to Work Agreement incorporated a Resident Protection Agreement that required CHA to negotiate with the Central Advisory Council of the CHA tenants (the "CAC") a legally enforceable lease amendment outlining the rights of CHA residents relocated under the Plan for Transformation. (*Id.*, Ex. B, Moving to Work Agreement at 9.)

On January 16, 2001, CHA entered into the Relocation Rights Contract with the CAC on behalf of all CHA tenants. (*Id.* ¶ 90.) The contract applied retroactively to all CHA tenants as of October 1, 1999—the effective date of the Plan for Transformation. (*Id.*, Ex. C, Relocation Rights Contract.) This contract establishes the temporary and permanent housing relocation choices for CHA tenants whose buildings were slated for demolition. (*Id.*) Tenants choosing permanent vouchers forfeit their right to return to public housing in the future, whereas those choosing temporary vouchers retain the right to return. (*Id.* ¶ 91.) In addition, under the terms of

3

the contract CHA must provide counseling on transition and moving to "opportunity areas," (*id.*, Ex. C, ¶ 6(a)), public transportation stipends and moving assistance, (*id.*, Ex. C, ¶ 6(f)), and must assure access to existing social services for CHA residents, (*id.*, Ex. C, ¶ 6(j)). Each of the named Plaintiffs moved from or within CHA buildings sometime between 1995 and the present. Each Plaintiff alleges that she was denied adequate relocation services, was relocated to sub-standard, racially segregated housing or was otherwise subjected to housing discrimination by CHA's practices.

## LEGAL STANDARDS

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we treat the complaint allegations as true, and view all well-pleaded facts and inferences drawn therefrom in the light most favorable to the plaintiff. *Marshall-Mosby v. Corp. Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000). A Rule 12(b)(6) motion should be granted only if it appears beyond doubt that Plaintiffs can prove no set of facts in support of their claims that would ultimately entitle them to relief. *Id.*

## ANALYSIS

Plaintiffs filed a thirteen-count amended complaint, raising claims of racial steering, perpetuation of segregation, breach of contract and various violations of the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, the Quality Housing and Work Responsibility Act of 1988 ("QHWRA"), 42 U.S.C. § 1437c-1(d)(15), the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("URA"), 42 U.S.C. § 4601, *et seq.*, and two Executive Orders issued by Presidents Kennedy and Clinton. Plaintiffs bring these federal statutory claims against CHA pursuant to 42 U.S.C. § 1983.

## I. Statute of Limitations

Before reaching the question of whether Plaintiffs have stated a claim under these statutes and § 1983, we must address Defendants' threshold argument that several of the plaintiffs or members of the plaintiff class are barred by the two-year statute of limitations applicable to claims under § 1983 and the Fair Housing Act. Plaintiffs respond that each of their claims survives under the "continuing violations doctrine" because they have alleged a continual practice or policy by Defendants to place CHA residents into segregated neighborhoods by failing to provide appropriate relocation services. Plaintiffs argue that because CHA has continually failed since 1995 to provide adequate relocation services to them, or any member of the putative class, they each have suffered an injury within the statutory period.

Defendants reject Plaintiffs' "continuing violation" theory on a number of grounds. First, Defendants argue that the continuing violations doctrine applies only to continuing wrongs, as opposed to a series of discrete but related acts, which is the case here. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 102, 113 (2002); *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 992 (7th Cir. 2002). Furthermore, Defendants argue that, even if this Court accepts a continuing violations theory, at a minimum any claims by Plaintiffs who were relocated prior to the execution of the Relocation Rights Contract in October 1999 are time-barred because that contract was an intervening event that interrupted the continuum of CHA conduct.

We believe that *Morgan* controls our inquiry here and that the continuing violations theory does not toll the time-barred Plaintiffs' claims. The Supreme Court in *Morgan* drew a distinction between "discrete discriminatory acts" such as termination, failure to promote or failure to hire, and those acts contributing to a hostile work environment. The Court noted that

5

"[h]ostile environment claims are different in kind from discrete acts" in that such claims "are based on the cumulative effect of individual acts." *Morgan*, 536 U.S. at 115. Thus the Court held that the former "are not actionable if time-barred, even when they are related to acts alleged in timely filed charges, " *id.* at 113, but that the latter may be deemed timely so long as the employee files "a charge within 180 or 300 days of any act that is part of the hostile work environment," that is, an act that contributes to the hostile work environment, *id.* at 118. The Supreme Court made clear, however, that the reach of the continuing violations doctrine in the context of a hostile work environment claim is not limitless. The otherwise time-barred conduct must be related to non-time-barred conduct and the employer may be able to take intervening curative action that cuts off the temporal reach of the hostile work environment claim. *Id.* at 118.

This case is, of course, different from a routine employment discrimination case. But the Seventh Circuit has held that *Morgan's* reasoning applies equally to cases brought under § 1983. *See Hildebrandt v. Ill. Dep't of Nat. Resources*, 347 F.3d 1014, 1036 n.18 (7th Cir. 2003). As an initial matter, we agree with Defendants that the continuing violations theory does not apply to the individual plaintiffs in this case, at least in the manner in which Plaintiffs have articulated it. Our reading of the complaint and the parties' briefs leads us to conclude that Plaintiffs are actually alleging some amalgam of the continuing violations theory and a "pattern or practice" case, perhaps in an attempt to avoid the inevitable conclusion that each Plaintiff alleges only discrete discriminatory acts. According to Plaintiffs, because CHA failed to provide any or adequate services to members of the plaintiff class in the period immediately preceding the filing of this lawsuit, each class member has suffered an injury within the two-year statute of limitations. (R. 20, Pls.' Resp. at 8.) Plaintiffs further argue that their claims are distinct from

6

the typical Title VII case alleging discrete discriminatory acts because "any claim of continued segregation must be comprised of multiple individual incidents of CHA's action (or inaction) towards multiple families.[1]

But Plaintiffs' mingling of standards cannot hide the fact that they are alleging only a series of discrete discriminatory acts that, under *Morgan*, cannot be linked to a timely act to avoid the running of the statute of limitations. And, even were we to accept a continuing violations theory, either for individual plaintiffs or under a sufficiently alleged "pattern-or-practice" claim, we would hold that it would start running, at the earliest, from October 1, 1999—the date on which CHA became contractually bound and otherwise obligated under federal law to provide relocation services. The Relocation Rights Contract constitutes an intervening event that interrupted the temporal reach of the continuing violations doctrine. Thus, we hold that any acts occurring more than two years before the filing of the initial complaint on January 23, 2003 are time-barred.[2]

---

[1] Although Plaintiffs never specifically allege that they are proceeding under a pattern-or-practice theory, they do consistently allege that CHA had a policy of providing inadequate relocation services. The Supreme Court explicitly refrained from deciding when, if ever, and how the continuing violations theory applies to "'pattern-or-practice' claims brought by private litigants." *Morgan*, 536 U.S. at 115 n.9. But to the extent Plaintiffs seek to proceed on a "pattern-or-practice" theory under any of their claims, they should explicitly allege this theory and support it with proper allegations. We may revisit our decision to limit the claims to 2001 and later if Plaintiffs can establish: (1) that they may properly bring "pattern-or-practice" claims as private litigants under the various federal statutes that they cite; and (2) that proceeding under this theory impacts our decision to limit Plaintiffs' claims to 2001 and later.

[2] But we reject at this time Defendants' laches defense because we do not believe that Defendants have demonstrated that Plaintiffs acted with an unreasonable lack of diligence in pursuing these claims, or that Defendants have suffered prejudice arising from them.

7

## II. Violation of CHA's duty to "affirmatively further" fair housing

In Counts I through IV, Plaintiffs allege that CHA breached its duty to affirmatively further fair housing in violation of the Fair Housing Act, 42 U.S.C. § 3608(e)(5) (Count I), the Quality Housing Work Rehabilitation Act ("QHWRA"), 42 U.S.C. § 1437c-1 (Count II), Executive Orders 11063 and 12892 (Count III), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Count IV). In moving to dismiss, Defendants argue that § 1983 rights are created only by statutes that clearly evidence Congressional intent to confer such rights, and that the statutes, regulations and orders on which Plaintiffs rely do not create a right to "affirmatively furthered fair housing" that is cognizable under § 1983. In response, Plaintiffs rely on the test articulated by the Supreme Court in *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997),[3] as well as on a district court case from Massachusetts that applies the *Blessing* test to almost identical claims. *See Langlois v. Abington Hous. Auth.*, 234 F. Supp. 2d 33 (D. Mass. 2002). As discussed in more detail below, we agree with the court's reasoning in *Langlois*, and believe that, except for their claim under Title VI, Plaintiffs have stated claims under § 1983 in counts one through three.

---

[3] In *Blessing*, the Supreme court identified three factors as instructive in determining whether or not a statute confers a right enforceable by a plaintiff under § 1983:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States.

*Blessing*, 520 U.S. at 340-41.

## A. Violation of the Fair Housing Act ("FHA"): 42 U.S.C. § 3608(e)(5)

In Count I, Plaintiffs allege a violation of the Fair Housing Act, 42 U.S.C. § 3608(e)(5), as well as several HUD regulations that also articulate a duty to affirmatively further fair housing. *See* 24 C.F.R. §§ 107.20(a); 903.7(o); 960.103(b); 982.53(b)-(c). That section of the Fair Housing Act provides in pertinent part:

> The Secretary of Housing and Urban Development shall—administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter . . . .

42 U.S.C. § 3608(e)(5). The policy underlying the Fair Housing Act is to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Defendants raise two arguments in support of their motion to dismiss this count. First, Defendants argue that the Supreme Court's decision in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), controls our inquiry. In *Gonzaga*, the plaintiff sued under § 1983, alleging violations of FERPA, a federal spending statute, when his university released private educational records to unauthorized persons. The Supreme Court held that FERPA did not create an enforceable right under § 1983 because the act contained no individual "rights-creating" language and instead was "two steps removed" from the interests of the plaintiff because it focused exclusively on the duties of the higher-education institutions and is directed at the Secretary of Education. *Id.* at 287.

But we do not believe that *Gonzaga* applies to this case for a number of reasons. First, the statute at issue in *Gonzaga* was enacted pursuant to Congress's spending power, whereas the Fair Housing Act is a civil rights statute concerned with remedying past housing discrimination. This is significant, according to the Supreme Court, because there is "far less reason to infer a

9

private remedy in favor of individual persons if Congress . . . had written [the statute] simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices." *Id.* (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690-93 (1979)). In the present case, Congress drafted the FHA, like Title IX at issue in *Cannon*, with an explicit focus on those who have traditionally been victims of discrimination in housing. Furthermore, the Supreme Court in *Gonzaga* found that FERPA's nondisclosure provisions only speak in terms of "institutional policy and practice," as opposed to "whether the needs of any particular person have been satisfied" and therefore could not give rise to individual rights. *Id.* at 288 (quoting *Blessing*, 520 U.S. at 3430). Unlike FERPA, it is clear that the Fair Housing Act does aim to "confer individual rights upon a class of beneficiaries." *Id.* at 285. Finally, that several other sections of the Act explicitly confer individual rights in separate enforcement schemes, *see, e.g.,* 42 U.S.C. §§ 3605, 3606, does not, as Defendants suggest, mandate a finding that Congress did not intend to allow § 1983 plaintiffs to pursue an action under § 3608. To the contrary, the fact that private enforcement is available under the Act supports our conclusion that Congress intended to confer rights upon a class of individuals. Therefore, we find Defendants' reliance on *Gonzaga* unpersuasive in the present case.

Second, Defendants argue that, in the absence of the rights-creating language, Plaintiffs cannot rely on HUD regulations, which do impose an obligation on PHAs to affirmatively further fair housing, to fill the gap. In its reply CHA concedes that, as a recipient of HUD funds, it has an obligation to HUD to affirmatively further fair housing, but denies that this obligation extends to Plaintiffs under a private cause of action. (R. 23, Defs.' Reply at 10.); *Otero v. N.Y. City*

10

*Hous. Auth.*, 484 F.2d 1122, 1133-34 (2d Cir. 1973) (noting that the affirmative duty to further fair housing placed on the Secretary of HUD by § 3608(e)(5) also applies to "other agencies administering federally-assisted housing programs"). Given our finding above that § 3608(e)(5) does create an individual right that is enforceable under § 1983, Defendants' argument that HUD regulations cannot be used to fill this void also is unavailing.

Additionally, we believe that the provisions § 3608(e)(5) of the Fair Housing Act easily pass the *Blessing* test. *See Langlois*, 234 F. Supp. 2d at 71-72. At issue in this case is the first prong of the *Blessing* test, because there is little dispute that the language of the act is mandatory; nor can the parties seriously contend that a claim under the Fair Housing Act strains judicial competence. *See* note 3, *supra*. With respect to this first prong, we agree with the *Langlois* court that "[i]t could not be clearer from the statute, the legislative history, and the case law construing it, that [§ 3608(e)(5)] was intended to benefit the plaintiffs here: people in desperate need of access to fair housing, minorities and the poor." *Id.* at 72. As noted above, Congress drafted the Fair Housing Act with an explicit focus on those who have traditionally been victims of discrimination in housing. *See Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972) (citing Senator Mondale, a chief sponsor of the FHA, as stating that one of the Act's purposes was to create "truly integrated and balanced living patterns."). Thus, for the foregoing reasons, we hold that Plaintiffs may sue under § 1983 to combat a violation of § 3608(e)(5) of the Fair Housing Act.

**B.    Violation of the Quality Housing and Work Responsibility Act ("QHWRA"): 42 U.S.C. § 1437c-1(d)(15)**

Similarly, we believe that Plaintiffs' Count II, which alleges violations of the QHWRA, also survives dismissal. The United States Housing Act, as added by the QHWRA, directs PHAs to prepare plans that describe how they will meet the housing needs of eligible families in their jurisdictions. Section 1437c-1(d)(15) requires a PHA to certify that it "will carry out the public housing agency plan in conformity with [Title VI, the FHA, the Rehabilitation Act of 1973, and the Americans with Disabilities Act], and will affirmatively further fair housing." For the same reasons as stated above with respect to § 3608(e)(5), this statute also passes *Blessing's* three-prong test. In fact, the QHWRA provisions apply even more strongly than the duty articulated in § 3608(e)(5) since it is directed explicitly at PHAs rather than the Secretary of HUD.[4] Thus, Defendants' motion to dismiss Count II fails as well.

**C.    Violation of Executive Orders 11063 and 12892**

Plaintiffs further claim in Count III that Executive Orders 11063 and 12892, issued by Presidents Kennedy and Clinton, respectively, also create a duty to affirmatively further fair housing that Plaintiffs may enforce under § 1983. These orders direct the heads of federal agencies to "take all action necessary and appropriate to prevent discrimination," Executive Order 11063, 27 Fed. Reg. 11527 (Nov. 20, 1962), and to "ensure that [their] programs and activities relating to housing and urban development are administered in a manner affirmatively

_____

[4] Furthermore we agree with Plaintiffs that Congress explicitly authorized § 1983 suits under the QHWRA. *See* 42 U.S.C. § 1437c-1(i)(4)(B). That section primarily addresses the consequence of the Secretary's disapproval of a PHA plan submitted pursuant to the section and a failure to provide notice of such lack of compliance. But the section also states that judicial review is not precluded, nor is "an action regarding such compliance under section 1983 of this title." *Id.*

to further the goal of fair housing," Executive Order 12892, 59 Fed Reg. 2939 (Jan. 17, 1994).

Defendants move to dismiss on the ground that only Congress creates enforceable federal rights

and thus Executive Orders can never stand alone as a source of federal rights. *See Save our*

*Valley v. Sound Transit*, 335 F.3d 932, 939, 943 (9th Cir. 2003). In response, Plaintiffs argue

that the Executive Orders: (1) were incorporated into the enforcement scheme of the FHA and

thus have force and effect of law because they are tantamount to being issued pursuant to

Congressional authority, or at least Congressional ratification; and (2) otherwise pass the

*Blessing* test. Although somewhat of a closer call, we hold that these Executive Orders also are

enforceable through § 1983 because both were explicitly incorporated into the FHA. As the

*Langlois* court observed:

> 42 U.S.C. § 3608 sets out the obligations of the Secretary of Housing and Urban
> Development in administering the Fair Housing Act. Section 3608(e)(6) requires the
> Secretary to make annual reports to Congress and the public regarding the data
> underlying various HUD-administered programs that falls under the coverage of a list
> of specified laws. That list of laws is set forth in § 3608(f), and both Executive
> Orders 11063 and 12892 are on it. 42 U.S.C. § 3608(f)(11). In other words,
> Congress has now explicitly made the Secretary responsible for keeping track of
> whether the programs he administers—which surely include the Section 8
> program—comply with Executive Orders 11063 and 12892. Accordingly, regardless
> of whether the Executive Orders would have had the force of law standing alone, I
> find that they do so now, as incorporated by Congress into the Fair Housing Act.

*Langlois*, 234 F. Supp. 2d at 75. Given this conclusion, we need not decide whether the

Executive Orders independently satisfy the *Blessing* test. Defendants' motion to dismiss Count

III is denied.[5]

---

[5] We wish to emphasize that our holding is strictly limited to the unique nature of these
two Executive Orders, which Congress explicitly incorporated into the FHA. We recognize that
generally "[i]ndividual rights enforceable through § 1983—like implied rights of action—are
creatures of substantive federal law; therefore, they must be created by Congress." *Save Our
Valley*, 335 F.3d at 937-38; *see also Sandoval*, 532 U.S. at 286 ("Like substantive federal law

## D. Violation of Title VI of the Civil Rights Act of 1964

Finally, in Count IV, Plaintiffs allege that Defendants violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, when they failed to affirmatively further fair housing by their relocation practices. In moving to dismiss, Defendants argue that this count should be dismissed because Title VI prohibits only intentional discrimination and Plaintiffs impermissibly rely on regulations promulgated under Title VI that go beyond the language of § 2000d in an attempt to create intentional conduct enforceable through § 1983. *See Alexander v. Sandoval*, 532 U.S. 275, 284 (2001). Specifically, Plaintiffs rely on 24 C.F.R. § 1.4(b)(6), which is a regulation requiring any recipient of federal housing funding to "take affirmative steps to remedy the persisting effects of prior discrimination."[6] Defendants contend that this "failure to take affirmative action" cannot be characterized as intentional discrimination. Plaintiffs respond that their Title VI claim does not arise solely under the regulations, and that the 1969 *Gautreaux* decision, wherein the court found that CHA had intentionally chosen sites for public housing for the purpose of maintaining existing patterns of racial segregation in the city, independently supplies predicate acts of intentional discrimination. *Gautreaux v. Chicago Hous. Auth.*, 296 F. Supp. 907 (N.D.

---

itself, private rights of action to enforce federal law must be created by Congress").

[6] Section 1.4(b)(6) consists of two sections; Plaintiffs do not specify the subsection on which they rely. Subsection (i) states that "[i]n administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color or national origin, the recipient must take affirmative action to overcome the effect of prior discrimination." 24 C.F.R. § 1.4(b)(6)(i). Subsection (ii) states that "[e]ven in the absence of such prior discrimination, a recipient in administering a program should take affirmative action to overcome the effects of conditions which resulted in limiting the participation by persons of a particular race, color, or national origin." 24 C.F.R. § 1.4(b)(6)(ii).

Ill. 1969). The regulation, Plaintiffs reason, simply fleshes out CHA's obligation to affirmatively further fair housing in light of this prior intentional discrimination.

We agree with Defendants that the viability of this count hinges on *Sandoval*, and thus the question becomes whether the regulation Plaintiffs cite applies § 601's ban on intentional segregation, or whether that regulation is promulgated as a disparate-impact regulation under § 602. *See* 42 U.S.C. §§ 2000d; 2000d-1; *Sandoval*, 532 U.S. at 284-85 (holding that "regulations applying § 601's ban on intentional discrimination are covered by the cause of action to enforce that section," but that disparate-impact regulations promulgated under § 602 that do not also fail to comply with § 601 are not actionable under § 601). If it is the latter, then Plaintiffs' claim fails, because § 601 prohibits only intentional discrimination, *Sandoval*, 532 U.S. at 280, and there is no private right of action to enforce disparate-impact regulations under Title VI, *id.* at 293. Our reading of the relevant authority convinces us that, even in light of the prior-intentional-discrimination finding in *Gautreaux*, that the regulation on which Plaintiffs rely does not relate to intentional conduct proscribed and actionable under § 601. It simply is too far of a stretch to say that intentional discrimination that occurred during the construction of CHA high-rises in the 1960s, which is the subject of *Gautreaux*, can serve as an underlying basis for finding that a failure to affirmatively further fair housing during the *destruction* of those very same buildings over thirty years later constitutes intentional conduct under § 601. Indeed, the regulation explicitly states that the duty to affirmatively overcome the effects of prior discrimination only applies to a presently administered CHA program that was found to have engaged in prior discrimination. We cannot say that the housing scheme at issue in *Gautreaux*

15

and the present Plan for Transformation are the same program for purposes of the regulation. Accordingly, we dismiss Count IV for failure to state a claim.

## III. Fair Housing Act Violations: Perpetuation of Segregation and Adverse Disparate Impact

Defendants next move to dismiss Counts V through VI and Counts VIII through X, which allege various violations of the Fair Housing Act relating to claims of perpetuation of segregation and adverse disparate impact on the basis of race, gender and family status. First, Defendants argue that Plaintiffs have failed to state a claim for perpetuation of segregation because they have failed to satisfy the four-part test articulated by the Seventh Circuit in *Metropolitan Housing Development Corporation v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977), which is used to determine whether otherwise-neutral policies have unlawful adverse effects. Additionally, Defendants contend that Plaintiffs have failed to state a claim for perpetuation of segregation because the whole point of the Plan for Transformation and the building demolitions is to *reduce* segregation by creating mixed-income developments in place of segregated high-rises. Finally, Defendants note that under federal law CHA residents have freedom of choice in making their housing decisions. This choice breaks any causal connection between CHA's neutral policies and the effects of perpetuating segregation. (R. 23, Defs.' Reply at 18.)

We find Defendants arguments favoring dismissal unpersuasive. Plaintiffs assert, and we agree, that CHA misstates the applicable pleading standards necessary to withstand a motion to dismiss. Plaintiffs point out that *Arlington Heights* was decided after an appellate remand and after a trial and therefore the four-part test used in that case applies only to decisions on the merits. According to Plaintiffs, in order to properly plead claims of adverse disparate impact, they need only allege an occurrence of outwardly neutral practices that have significant adverse

16

or disproportionate impact on a protected class. *See Pfaff v. United States Dep't of Hous. and Urban Devel.*, 88 F.3d 739, 745 (9th Cir. 1996); *Huntington Branch NAACP v. Town of Huntington,* 844 F.2d 926, 938 (2d Cir. 1988). We agree with Plaintiffs that Defendants are attempting to hold them to a higher pleading standard than is required. Plaintiffs have adequately pled disparate impact and thus, Counts V and VI through VIII survive Defendants' motion to dismiss.

**IV. Racial Steering Claims**

With respect to Counts VI and VII, which allege racial steering in violation of the FHA and Title VI, Defendants primarily argue in moving to dismiss that Plaintiffs have failed to plead the intentional conduct required to state a claim of racial steering. *See Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1529 (7th Cir. 1990); *Heights Cmty. Congress v. Hilltop Realty, Inc.,* 744 F.2d 135 (6th Cir. 1985). Again, Plaintiffs argue that Defendants are imposing heightened pleading standards that are irrelevant at this stage of the proceeding. In order to state a claim for racial steering, Plaintiffs need only allege that CHA intended to influence Plaintiffs' housing choices on a race-related basis. *Havens Realty Corp. v. Coleman*, 455 U.S. 366 n.1 (1982) (defining racial steering as a practice by which defendants "preserve and encourage patterns of racial segregation in available housing by steering members of racial and ethnic groups to buildings occupied primarily by members of such racial or ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups."); *Vill. of Bellwood v. Dwayne Realty*, 482 F. Supp. 1321, 1331 (N.D. Ill. 1979) (noting that racial steering "may be established either by proof of purpose or of effect"). Plaintiffs have included numerous allegations that support their claim of racial steering, and therefore we do not believe that

17

dismissal of Counts VI and VII is warranted. (*See, e.g.*, R. 14, Am. Compl. ¶¶ 3, 70-72) (alleging that CHA "blatantly steered Plaintiffs to predominantly African-American neighborhoods" and that "CHA intended and/or knew or should have known that its actions or omissions would have the effect of discouraging Plaintiffs from inspecting or renting in predominately white or racially integrated neighborhoods").

## V. Violation of the Uniform Relocation Assistance and Real Property Acquisition Act of 1970

In Count XI Plaintiffs allege that Defendants violated the Uniform Relocation Assistance and Real Property Act ("URA") of 1970 by failing to operate a relocation assistance program that adequately assesses the needs of the displaced families. (*Id.* ¶ 276.) We agree with Defendants that this count must be dismissed because the Administrative Procedures Act ("APA") is the exclusive remedy for URA claims, and thus such claims are not cognizable under § 1983. *See Nat'l R.R. Passenger Corp. v. Faber Enters., Inc.*, 931 F.2d 438, 443 (7th Cir. 1991) (noting that URA court has no jurisdiction over a claim brought pursuant to the URA); *Ackerly Communications of Fla., Inc. v. Henderson*, 881 F.2d 990, 993 (11th Cir. 1989) (Administrative Procedure Act is exclusive remedy for alleged violations of the URA); *Rhodes v. City of Chi.*, 516 F.2d 1373, 1378 (7th Cir. 1975) (federal courts lack jurisdiction over actions seeking enforcement of policies outlined in 42 U.S.C. § 4651 *et seq.*). Plaintiffs have failed to allege a claim under the APA, and, even if § 1983 relief were available under the URA, Plaintiffs in any event have failed to demonstrate that they exhausted their administrative remedies before filing suit. Accordingly, Count XI is dismissed.

## VI. Breach of Contract Claims

Finally, in Counts XII and XIII, Plaintiffs allege breach of contract claims on behalf of the post-1999 Plaintiffs. With respect to Count XII, which alleges that Defendants breached the Moving to

Work Agreement, Defendants point out that Plaintiffs are not parties to that agreement, and cannot be considered third-party beneficiaries under it. Defendants further urge us not to exercise our pendent jurisdiction over these state-law contract claims.

We turn first to the question whether Plaintiffs may assert rights as third-party beneficiaries under the Moving to Work Agreement between CHA and HUD. As an initial matter, we believe that Illinois law, and not federal common law, applies to this question. *See Miree v. DeKalb County*, 433 U.S. 25, 32-33 (1977) (holding that state and not federal common law applies to third-party beneficiary claims arising out of a contract between a federal agency and the county where the United States, although a party to the contract, was not also a party to the lawsuit); *cf. Holbrook v. Pitt*, 643 F.2d 1261, 1270 n.16 (7th Cir. 1981) (applying federal common law to third-party beneficiary claim because federal agency was party to the lawsuit and because the outcome of the case would directly affect substantial financial obligations of the United States). In this case HUD is not named as a party to the action, and thus unlike *Holbrook*, we believe that Illinois law controls.

Under Illinois law, there is a strong presumption against creating rights in a third-party beneficiary. To overcome this presumption the intent to benefit a third party must affirmatively appear from the language of the contract and the circumstances surrounding the parties at the time of execution. *Quinn v. McGraw-Hill Cos.*, 168 F.3d 331, 334 (7th Cir. 1999); *see also Bates & Rogers Construction Corp. v. Greely & Hansen*, 486 N.E.2d 902, 906 (Ill. 1985). Only intended beneficiaries have rights; an incidental beneficiary has no rights under a third-party beneficiary contract. *B.C. v. J.C. Penney Co.*, 562 N.E.2d 533, 539-40 (Ill. App. Ct. 1990). "Express language in the contract identifying the third-party beneficiary is the best evidence of intent to benefit that party, but the courts have also accepted an implied showing where the implication that the contract applies to third parties is

19

so strong as to be practically an express declaration." *Quinn*, 168 F.3d at 334 (internal citations and quotations omitted).

Applying the foregoing principles to the Moving to Work Agreement, which was appended to the first amended complaint, convinces us that Plaintiffs lack standing to sue under that contract as third-party beneficiaries. First, although one of the aims of the agreement is to "design and test innovative methods of providing housing and delivering services to low-income families in an efficient and cost effective manner," (R. 14, Am. Compl., Ex. B, Moving to Work Agreement at 2), the language of the agreement generally is geared towards delineating the obligations of HUD and CHA, financial and otherwise, in attaining that goal. Furthermore, although the Resident Protection Agreement is incorporated by reference into the Moving to Work Agreement, (*id.*), this fact is not dispositive in determining whether CHA residents should be accorded third-party beneficiary status. *Bd. of Educ., Sch. Dist. No. 15, Du Page County v. Fred L. Ockerlund, Jr. & Assocs., Inc.*, 519 N.E.2d 95, 97 (Ill. App. Ct. 1988) (holding that mere fact that underlying construction contract was incorporated by reference into bond agreement did not cast plaintiffs "into the role of a direct third-party beneficiary on the bond"); *Young v. Gen. Ins. Co. of Am.*, 337 N.E.2d 739, 741-42 (Ill. App. Ct. 1975). Indeed, the very fact that the Moving to Work Agreement envisions that CHA and its residents would enter into a separate agreement governing their rights and responsibilities during the Plan for Transformation undercuts Plaintiffs' argument that they should be accorded third-party beneficiary status. Finally, the Moving to Work Agreement does not demonstrate that the parties to that agreement unequivocally intended to confer a benefit enforceable by Plaintiffs. As noted above, the standard under Illinois law for conferring third-party beneficiary status on a party is much more stringent than that under federal common law. *Compare Holbrook*, 643 F.2d at 1271 (holding that housing residents

were third-party beneficiaries under contracts between HUD and building owners when the language of Section 8, relevant legislative history and HUD's own implementing regulations demonstrated that tenants were primary beneficiaries of the contract) *with 155 Harbor Drive Condominium Ass'n v. Harbor Point, Inc.*, 568 N.E.2d 365, 374-75 (Ill. App. Ct. 1991) (holding that "it is not enough that the parties to the contract know, expect or even intend that others will benefit from the construction of the building in that they will be users of it. The contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear.") (internal citations and quotations omitted). Because the language and structure of the Moving to Work Agreement does not demonstrate the parties' intent to confer an explicit benefit on CHA residents, we believe that Plaintiffs cannot satisfy the stringent third-party beneficiary standard under Illinois law and accordingly dismiss their claim under Count XII. Post-1999 Plaintiffs may, of course, maintain a cause of action for breach of the Relocation Rights Contract, to which they were parties, and we decline Defendants' urging to dismiss this pendent state-law claim. Thus, Defendants motion to dismiss Count XIII is denied.

## CONCLUSION

As the final salvo in their motion to dismiss, Defendants argue that there is no basis for this Court's interference in the Plan for Transformation. Instead, Defendants insist that we must allow them an appropriate opportunity to exercise their discretion in choosing the appropriate course of corrective action. We disagree. It is both within this Court's province and duty to hear and decide claims alleging racially motivated housing discrimination. Plaintiffs have adequately stated claims under the Fair Housing Act, the QHRWA, Title VI and for breach of contract. Accordingly, for the foregoing reasons we grant Defendants' motion to dismiss Counts IV, XI and XII of Plaintiffs' first amended complaint, but deny Defendants' motion to dismiss the remaining counts. (R. 17-1.)

21

ENTERED: 

**Judge Ruben Castillo**
**United States District Court**

**Dated: December 23, 2003**